UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| USA SATELLITE & CABLE, INC. | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | Case No. 1:15-cv-6331 |
| | ) | |
| W. JAMES MACNAUGHTON, CASCO | ) | Judge St. Eve |
| BAY HOLDINGS LLC | ) | Magistrate Judge Weisman |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

## REPORT AND RECOMMENDATION

Plaintiff USA Satellite & Cable, Inc. ("USA") filed a motion to enforce settlement agreement [184] on October 30, 2017, which the District Court referred to this Court for a Report and Recommendation. For the reasons set forth below, the Court recommends that Plaintiff's motion be denied.

### BACKGROUND

Defendant W. James MacNaughton ("MacNaughton") formerly represented USA and its principal, Shai Harmelech. Since the breakdown of the attorney-client relationship, the parties have been engaged in ongoing litigation in various courts. In the instant matter, Plaintiff alleges that MacNaughton breached his fiduciary duty and that MacNaughton and his company, Casco Bay Holdings LLC ("Casco Bay"), intentionally interfered with Plaintiff's contractual relations.

This Court held a settlement conference on September 8, 2017 with Plaintiff's counsel (Peter Swan), Shai Harmelech, MacNaughton's counsel (George Flynn), and MacNaughton. The parties were unable to reach an agreement and have differing views on how the settlement conference ended. According to Plaintiff, a firm demand of $40,000.00 remained pending at the

conclusion of the conference. (Dkt. 192 at ¶ 2.) MacNaughton, however, contends that the parties merely discussed the possibility of MacNaughton's insurance carrier paying $40,000.00 to Plaintiff to be held in trust by Mr. Swan and then transferred to MacNaughton or Casco Bay in partial satisfaction of MacNaughton's judgments against Plaintiff in different matters. (Dkt. 191 at p. 4.)

Following the settlement conference, Mr. Flynn spoke with Mr. Swan on September 11, 2017 and allegedly confirmed an increased settlement authority of $40,000.00.[1] Plaintiff argues that this conversation constituted an enforceable oral settlement agreement. MacNaughton[2] disputes Plaintiff's characterization of the call, and contends that the parties simply discussed a *potential* settlement agreement. (Dkt. 191 at p. 4.) Subsequent to the phone conversation with Mr. Flynn, Mr. Swan emailed MacNaughton directly, indicating that MacNaughton's insurance company would increase settlement authority to $40,000.00 if Mr. Swan could "make a deal to settle everything" with MacNaughton. (Dkt. 201 at Exh. J.) Mr. Swan stressed that he did not want "to blow this opportunity." (*Id.*)[3]

---

[1] The Court notes that Plaintiff characterizes the September 11, 2017 phone call in two different ways. In its motion, Plaintiff states that Mr. Flynn called with the increased offer of $40,000.00 and that Mr. Swan accepted during the call. (Dkt. 184 at ¶ 1.) In its reply brief, however, Plaintiff suggests that Mr. Flynn accepted the $40,000.00 demand, which was pending at the end of the settlement conference. (Dkt. 192 at ¶ 2.) This distinction affects the timing of the alleged offer and acceptance. In the first scenario, Mr. Flynn offered $40,000.00 on September 11th and Mr. Swan accepted; in the second, Mr. Swan offered $40,000.00 at the end of the settlement conference and Mr. Flynn accepted on September 11th.

[2] Plaintiff initially attempts to enforce the purported settlement agreement reached by Mr. Swan and Mr. Flynn against both MacNaughton and Casco Bay. Mr. Flynn, however, only represents MacNaughton. Without Casco Bay's consent, Casco Bay cannot be bound to a settlement agreement. Plaintiff seems to acknowledge this point in its reply by narrowing its focus to enforcing the settlement between Plaintiff and MacNaughton. (Dkt. 192 at p. 4.)

[3] The exact language of the email is as follows:
> Jim: The insurance company will go to $40,000 if I can make a deal to settle everything with you.
> I don't want to blow this opportunity. There is a $110,000 on the table which pays off the 2016
> judgment and funds another approximately $30,000 against the [related judgment against
> Plaintiff]. So you will have collected your attorney's fees and another $80,000 on top of that.
> Please consider this as continuing with these lawsuits is clearly a much harder and less sure
> method of receiving funds from Shai.

(*Id.*) Mr. Swan's conditional language belies the notion that a deal *had been* struck. If he had reached a settlement agreement on the phone with Mr. Flynn, Mr. Swan presumably would have informed MacNaughton about the

On September 14, 2017, Mr. Swan emailed Mr. Flynn about the interplay between the purported settlement in this matter and the ongoing litigation between the parties in other courts:

> I would like to get this settlement wrapped up. One issue is MacNaughton's ongoing attempt to enforce [a related judgment against Plaintiff] that will apparently continue after our settlement. Please send me the *proposed* release that you will be looking to have executed.

(Dkt. 184 at ¶ 2 (emphasis added).) Mr. Flynn responded: "My only concern is our case. The insurer is taking a very unusual step in settling this case, as you know." (*Id.*) He also noted that he is "only concerned with settling and dismissing the legal claims." (*Id.* at ¶ 3.)

On September 27, 2017, Mr. Swan contacted Mr. Flynn concerning the status of the "proposed settlement agreement" to which Mr. Flynn replied that he was waiting for McNaughton's comments and revisions. (*Id.*) Two days later, Mr. Flynn forwarded a proposed settlement agreement which included what MacNaughton characterized as a "typical General Waiver and Release." (Dkt. 191 at p. 4.) Mr. Swan rejected the proposed settlement agreement as it sought to obtain releases from individuals and entities not involved in the instant matter. On October 6, 2017, Mr. Swan sent Mr. Flynn a redlined draft settlement agreement, significantly altering the waiver and release provisions that MacNaughton had proposed. (*Id.* at p. 5.) Following additional email exchange regarding the language of the release, Mr. Swan sent another settlement agreement to Mr. Flynn on October 13, 2017 which allegedly altered the terms of the agreement so that MacNaughton would only receive $30,000.00 of the $40,000.00 settlement amount, allocating the remaining $10,000.00 to Mr. Swan for his attorneys' fees. (*Id.*) MacNaughton contends that the parties never discussed such a change and MacNaughton would never have agreed to such a change. According to MacNaughton, an essential term of any settlement included payment by MacNaughton's insurance carrier to Mr. Swan's attorney-client

---

agreement. A conditional acceptance does not constitute an acceptance; rather, a conditional acceptance "is effectively a counteroffer." *Deere & Co. v. Ohio Gear*, 462 F.3d 701, 707 (7th Cir. 2006) (citing Illinois law).

trust account where the settlement funds would be held for two days. (*Id.* at p. 4.) Following the transfer of funds, the full amount of $40,000.00 was to be transferred to MacNaughton in partial satisfaction of judgments MacNaughton held against Plaintiff. (*Id.*) Thus, while in the normal course of settlement, the division of settlement proceeds between a party and its counsel may not be a material term of settlement, this case (for many reasons) is atypical and the "split" of the settlement proceeds between Plaintiff and its counsel did matter. Despite the significant revisions made by both parties, Plaintiff now attempts to enforce the purported settlement reached on September 11, 2017.

## DISCUSSION

Oral settlements are enforceable "if there is an offer, an acceptance, and a meeting of the minds regarding the terms." *Pritchett v. Asbestos Claims Mgmt. Corp.*, 332 Ill. App. 3d 890, 896 (5th Dist. 2002).[4] For a settlement agreement to be enforceable, "the essential terms . . . must be definite and certain." *City of Chi. v. Ramirez*, 366 Ill. App. 3d 935, 946 (1st Dist. 2006); *see also Pritchett*, 332 Ill. App. 3d at 896 ("An offer, or the acceptance thereof, must be so definite with respect to its material terms that the promises and performances to be rendered by each party are reasonably certain.") A meeting of the minds occurs "where there has been assent to the same things in the same sense on all essential terms and conditions." *Pritchett*, 332 Ill. App. 3d at 896.

Here, the parties did not enter into an enforceable oral settlement agreement because they did not reach a meeting of the minds on all material terms. First, the parties had no agreement as to the scope of the release – a provision that Plaintiff's counsel acknowledges is material. (12-21-17 Hearing Transcript, p. 10:15-19.) Such a provision is especially important here considering the litigation history between the parties and the ongoing matters in other courts.

---

[4] The parties agree that Illinois law governs the disputed settlement agreement. *See, e.g.*, *Artuk, Inc. v. AKT Corp.*, No. 13 C 3811, 2014 WL 3895920, at *4 (N.D. Ill. Aug. 7, 2014) ("Local state law, not federal law, governs the construction and enforcement of settlement.").

4

Plaintiff argues that Mr. Flynn's email that he is "only concerned with settling and dismissing the legal claims" demonstrates that Plaintiff and MacNaughton have agreed to settle any claims made by the parties (or could have been made by the parties) in the instant matter. The Court disagrees. Mr. Flynn's vague and ambiguous email cannot evidence a meeting of the minds as to the scope of the release. Moreover, the draft settlement agreements exchanged between the parties for weeks after an agreement was purportedly reached further demonstrate clear disagreement as to the breadth of release. In Plaintiff's proposed redline agreement on October 6th, for example, the entire "Waiver and Release" provision added by MacNaughton has been gutted, allowing for Plaintiff and Mr. Harmelech to pursue other claims in other venues against MacNaughton arising out of the attorney-client relationship. The absence of agreement as to the scope of the release renders the alleged settlement agreement unenforceable. *See, e.g.*, *Higbee v. Sentry Ins. Co.*, 253 F.3d 994 (7th Cir. 2001) (noting that "many defendants would agree that the *most* material term in any settlement agreement is the release") (emphasis in original); *Simmons v. Collection Prof'ls, Inc.*, No. 09-1198, 2010 WL 2663101, at *1 (C.D. Ill. June 29, 2010) ("The language and scope of any release to be provided is a material component of the settlement."); *Stericycle, Inc. v. RQA, Inc.*, 2014 IL App (1st) 133776-U, at ¶ 23 (finding the scope of release a material settlement term).

In addition, although Plaintiff suggests that the payment of $40,000.00 constituted a clear settlement term, Plaintiff's own proposed revisions on October 13th – over a month after the parties purportedly reached an agreement – challenge this argument. In its revised agreement, Plaintiff altered the terms so that MacNaughton would only receive $30,000.00 from the $40,000.00 held in trust by Mr. Swan and eventually transferred back to MacNaughton in partial satisfaction of judgments he held against Plaintiff. The remaining $10,000.00 would be paid to

Mr. Swan as attorneys' fees. (Dkt. 191 at p. 5.) In light of the unique nature of how the settlement amount would be allocated here due to the parties' litigation history, agreement on this provision is critical. Such a significant change to one of the few terms of the purported agreement suggests that the parties never experienced a meeting of the minds as to how much of the $40,000.00 would benefit Mr. MacNaughton.

Indeed, Mr. Swan's own conduct and language following the purported settlement further amplifies the lack of an enforceable settlement agreement. He emailed MacNaughton immediately following his conversation with Mr. Flynn and used language to suggest that a settlement had not yet been reached, including referring to the settlement as a future "opportunity." (Dkt. 201 at Exh. J.) Putting aside the ethical issues raised by contacting an insured directly and using such a communication to bind the insured, Mr. Swan's interaction with Mr. MacNaughton underscores the absence of an enforceable agreement. Other language used by Mr. Swan further supports this conclusion: Mr. Swan asked Mr. Flynn to send a "*proposed* release" on September 14th and requested that Mr. Flynn prepare a "*proposed* settlement agreement" on September 27th. (Dkt. 184 at ¶¶ 2–3.) As courts have noted, "'[a] distinction must be drawn between preliminary negotiations toward an agreement and the actual existence of a final contract.'" *Karris v. U.S. Equities Dev., Inc.*, 376 Ill. App. 3d 544, 550 (1st Dist. 2007)

Accordingly, based on the back-and-forth correspondence between Mr. Swan and Mr. Flynn, and Mr. Swan's own conduct after the purported settlement, the parties have not assented "to the same things in the same sense on all essential terms and conditions." *Pritchett*, 332 Ill. App. 3d at 896. It appears that the parties have not reached a meeting of the minds as to *any*

terms of a purported agreement, let alone the material terms. As such, an enforceable agreement was never formed.

## CONCLUSION

For the reasons set forth above, the Court recommends that the District Court deny Plaintiff's motion to enforce settlement agreement [184].

**SO ORDERED.**　　　　　　　　　　**ENTERED:  January 9, 2018**

*M. David Weisman*

**M. David Weisman**
**United States Magistrate Judge**